Birdie Mae **DAVIS** et al., Plaintiffs-Appellants,

United States of America, etc., Plaintiff-Intervenor,

v.

**BOARD OF SCHOOL COMMISSIONERS OF MOBILE COUNTY** et al., Defendants-Appellees,

Twila Frazier et al., Defendants-Intervenors.

No. 73–1603.

United States Court of Appeals, Fifth Circuit.

Aug. 27, 1973.

J. U. Blacksher, Mobile, Ala., Jack Greenberg, William Robinson, Norman Chachkin, New York City, for plaintiffs-appellants.

Abram L. Phillips, Jr., Victor T. Hudson, Mobile, Ala., for defendants-appellees.

C. S. White-Spunner, Jr., Mobile, Ala., Jerris Leonard, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for plaintiff-intervenor U. S.

Samuel L. Stockman, Mobile, Ala., for intervenor Mobile County P.T.A.

Ralph Kennamer, Pierre Pelham, Mobile, Ala., for intervenor Twila Frazer, and others.

Solomon S. Seay, Jr., Montgomery, Ala., for intervenor N. E. A., and others.

Before BELL, AINSWORTH and GODBOLD, Circuit Judges.

BELL, Circuit Judge:

This is the tenth appeal to this court arising out of the Mobile school desegregation case.[1] In addition, *Mobile XI* and *XII* are pending. Fortunately these appeals do not involve the student assignment problem. This problem was resolved on July 9, 1971 in a consent order incorporating "A Comprehensive Plan for a Unitary School System", formulated by the parties. This consent order was entered after the reversal by the Supreme Court in Davis v. Board of School Commissioners of Mobile County, 1971, 402 U.S. 33, 91 S.Ct. 1289, 28 L. Ed.2d 577, of *Mobile IX*. The litigation is now reduced to controversies over the location of one particular school building (this case—*Mobile X*); matters having to do with faculty assignment and tenure (*Mobile XI*), and a claim for attorneys' fees (*Mobile XII*).

One provision of the "Comprehensive Plan" was that the following provision of Singleton v. Jackson Municipal Separate School District, 5 Cir., 1970, 419 F. 2d 1211 (En banc), would be applicable to the Mobile System:

"All school construction, school consolidation, and site selection (including the location of any temporary classrooms) in the system shall be done in a manner which will prevent the recurrence of the dual school structure once this desegregation plan is implemented." 419 F.2d at 1218.

---

1. See Mobile IX, Davis v. Board of School Commissioners of Mobile County, 5 Cir., 1970, 430 F.2d 883, 884, and fn. 1 thereto, for a list of the previous appeals.

The consent order of July 19, 1971 incorporating the "Comprehensive Plan", also provided:

"The Court further retains jurisdiction to insure that future school construction and abandonment is not used and does not serve to perpetuate or reestablish the dual system".

The "Comprehensive Plan" contemplated a new middle school to replace the George Hall school and required that the school board select a site for the school, subject to approval of the court:

"The system is in need of an additional middle school facility between the B.C. Rain and the Hall communities. The Board of School Commissioners will seek professional assistance with the involvement of the respective communities in order to bring forth for approval of the Court the selection of a site and the construction of a new middle school as rapidly as possible. Hall will remain open only during this interim period providing an opportunity for the planning and construction of this new facility to further implement the proposed plan and providing the opportunity for a greater degree of integration. The plaintiff will be advised as the school system moves in this direction under the continued jurisdiction of the District Court."

In choosing a site location for the school in question, the school board received community in-put through a bi-racial committee composed of: (1) one representative from the faculty of each of the two schools (Hall and B.C. Rain) selected by the respective faculties; (2) one representative from the student body of each of the two schools selected by the respective student bodies; (3) one representative from the PTA of each of the two schools selected by the respective PTA's; (4) one representative from each of the two communities at large selected by the respective PTA's; (5) two representatives from the Mobile Ministerial Association (a predominantly white organization), one having connection with each community,

as selected by the Association; (6) two members from the Inter-Denominational Ministerial Alliance (a predominantly black organization), one having connection with each of the two communities, as selected by the Alliance; (7) one member of the Court's own Bi-Racial Committee designated by the Court.

This bi-racial committee adopted the following goal in recommending sites:

To recommend, to the Board of Education, a site or sites which is/are as nearly centrally located, geographically, to the white and black communities as possible which will maximize desegregation in the George Hall School District.

Five criteria were employed by the committee:

(1) Site must be one that is as nearly centrally located (geographically) as possible to maximize desegregation.

(2) Site must be one that will afford equal accessibility and availability to both the black and white communities.

(3) Site must be one which has sufficient acreage to meet present standards for a Middle School.

(4) Site must be one which has sufficient acreage to allow for future expansion.

(5) Site must be one which has adequate street access.

The bi-racial committee then made the following recommendation as to sites:

First Choice—Cassie Lane property.

Second Choice—Frazier property.

Third Choice—Texas Street Urban Renewal school site.

Fourth Choice—Brookley Air Force Base.

Plaintiffs' position here is that the Texas Street Urban Renewal site should have been selected rather than the Cassie Lane site. The bi-racial committee said of the Cassie Lane site:

"Located in residential area with some truck farms nearby. Near Brookley

Field which is zoned light industrial thereby eliminating possibility of ever having heavy polluting industries nearby."

As to the Texas Street site, the committee reported:

"Near downtown area. Nearer industrial area with shipbuilding companies and National Gypsum just across Interstate 10.

Next the school board sought the advice of the University of Alabama College of Education Bureau of Education Services and Research. This group assigned three professional educators to the task. They centered on only the Cassie Lane and Texas Street sites and selected the Cassie Lane site with the following conclusions:

"The evaluation committee has studied the available data relevant to the two sites and the judgments of the Chairman who made the on-site visit. The following represents our best judgment for recommending that the Cassie Lane site be selected for the new Hall-Rain Middle School:

1. The welfare of the students would be better protected in an area with less traffic congestion, less noise, and lower pollution levels.

2. The prospect of developing an integrated community, in addition to serving existing attendance areas, would be enhanced by locating the school in an area attractive to development. The existence of both an elementary and a new middle school in the B.C. Rain area should stimulate its development.

3. The selection of the Cassie Lane site for the new middle school would meet the Court-ordered criteria of '. . . a middle school facility between the B.C. Rain and the Hall community . . . which would provide opportunities for a greater degree of integration.' The Texas Street site would violate that charge. We judge that the selection of the Texas Street site would tend to resegregate the schools. The Cassie Lane site offers the best opportunity to work toward integrated school and residential communities.

Next, the professional staff of the school board studied the question and recommended the Cassie Lane site.

The school board then petitioned the district court on November 16, 1972 for approval of a site, opting for the Cassie Lane location. Plaintiffs filed their objections to the location and an evidentiary hearing followed. The district court approved the Cassie Lane site and denied a stay. This appeal followed and we denied a stay on April 5, 1973. We now affirm.[2]

As stated, the "Comprehensive Plan" was entered by consent order following the reversal of our decision in *Mobile IX,* supra. In reversing the Supreme Court said:

". . . the Court of Appeals felt constrained to treat the eastern part of metropolitan Mobile in isolation from the rest of the school system, and . . . inadequate consideration was given to the possible use of bus transportation and split zoning. . . ." 402 U.S. at 38, 91 S.Ct. at 1292.

2. The testimony adduced at the somewhat lengthy hearing in the district court in this case indicates that there is no uniformity of views amongst the plaintiff class. Counsel for plaintiffs conceded as much. In view of our decision on the merits, we do not reach any question as to whether the plaintiff class should have been divided into sub-classes for the purpose of presenting the varying views on the question presented. This problem could have been avoided by a petition to intervene on behalf of named intervenors. Cf. Lee v. Macon County Board of Education (Conecuh County), 5 Cir., 1973, 482 F.2d 1253; Hines v. Rapides Parish School Board, 5 Cir., 1973, 479 F.2d 762.

The importance of the foregoing is seen in the fact that no attention was given in the hearing as to how the site selection problem in question may have related to the Mobile student assignment plan as a whole. Leading counsel for the plaintiff class in formulating the consent plan and order of July 9, 1971 did not join in the district court action nor has he joined in this appeal.

The facts of this case point up the use of bus transportation and rezoning to integrate Hall and Eanes, two of the schools in the eastern part of Mobile.

Under the "Comprehensive Plan", Hall and Eanes were the middle schools to serve about one-half of the geographical area of the city of Mobile. They were to serve the southern half of the city bounded generally on the North and West by Government Street, on the East by Mobile Bay, and on the South and West by Dog River and Halls Mill Creek. The combined enrollment at the two schools for 1972–73 was 2,526; 1335 white students and 1191 black. The new school, to be substituted for Hall which is to be closed, is projected to have 663 white and 506 black students. Eanes will have 1020 white and 500 black students.

The real and only issue is that if the school is located on the Cassie Lane property rather than the Texas Street site, 426 additional black students will have to be transported by bus. The Texas Street site is at the Northeastern tip of the large geographical area involved and in a predominately black neighborhood. Plaintiffs' argument in essence is that they should be given a neighborhood school with an adequate percentage of whites to be transported in for integration purposes. Their theory is that the whites will be transported in any event and the extra travel involved is of only slight consideration.

This position is to be considered in the context of the total transportation of the two-school area:

| Year | School | No. of Students Transported | |
|------|--------|------|------|
| 1972–73 | Hall | W–446 | B–82 |
| 1972–73 | Eanes | W–479 | B–141 |
| 1973–74 | New School | W–401 | B–491 |
| | Eanes | W–554 | B–5 |

The total transportation picture for the area is that 925 white and 233 black students were transported in 1972–73 as compared to 955 white and 496 black students projected for 1973–74. Thus there will be a total of 273 additional black students transported in 1973–74 to the two schools in the area. It is true that bussing could be avoided for 426 black students by using the Texas Street site, 65 as compared to 491, but it would be necessary to bus 589 white students to the Texas Street site instead of 446 presently being bussed to Hall (401 projected for Cassie Lane).

As we see it, the net is that the Texas Street site would require 143 extra white students to be bussed when they are already being bussed in disproportionate numbers. The Cassie Lane site reduces the number of whites to be bussed by 45 but there is a projected increase at Eanes of 75. Thus the whites do not gain over the 1972–73 year. The black increase is because of closing a school nearer their home (Hall) and by not gaining the Texas Street site as a neighborhood school.[3]

■ Although it is clear that white students are not gaining at the expense of blacks in the site selection, there are substantial factors which support the selection of the Cassie Lane site over the Texas Street site. One is that the distances of transportation are reduced by having the new school centrally located. Another is that the new site is in a sparsely populated area with room to expand into an interracial community. The new site is a racially neutral location and was selected, according to the testimony of the chairman of the bi-racial committee, to make the burden of bussing equal and to take the burden off of any one community. The 1972–73 student assignment plan for Hall and Eanes was temporary under the "Comprehensive Plan" pending the building of a new middle school and such revision of zones and transportation as might ensue therefrom.

■ This case is symbolic of the difficulty in selecting sites for public buildings. Controversies over the selection of such sites are not ordinarily justiciable but are left to the public offi-

---

3. In Mobile, all students living more than two miles from a school are transported.

cials in charge. Wallis v. Blue, N.D.Ga., 1967, 263 F.Supp. 965, 970 (3 judge Dist.Ct.). Such questions are justiciable, however, in the context of racial discrimination. The scope of justiciability in school desegregation cases goes to questions of implementing the conversion of school systems from dual to unitary status, and to preventing the recurrence of the dual school structure. Singleton v. Jackson Municipal Separate School District, *supra*. Such questions also include preventing the imposition of the burden of desegregation on black students. See e. g., Mims v. Duval County School Board, 5 Cir., 1971, 447 F. 2d 1330, Lee v. Macon County Board of Education, 5 Cir., 1971, 448 F.2d 746.

We conclude that plaintiffs have not made out a case of error with respect to either of these propositions. The district court did not err in rejecting (1) the claim of racial discrimination on the part of the school board in selecting the Cassie Lane site; (2) the claim that the school board employed unlawful racial considerations in evaluating the two sites' (Cassie Lane and Texas Street); and (3) the claim that the burden of desegregation was unlawfully imposed on black students.

Affirmed.